# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| SORIN GROUP USA, INC., | Case No. 14-4023 (JRT/JSM) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY** |
| v. | |
| ST. JUDE MEDICAL, S.C., INC., | |
| Defendant. | |

James Poradek and Katherine Razavi, **FAEGRE BAKER DANIELS LLP,** 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, Jared B. Briant, **FAEGRE BAKER DANIELS LLP,** 3200 Wells Fargo Center 1700 Lincoln Street, Denver, CO 80203, for plaintiff.

JoLynn M. Markison and Joseph W. Hammell, **DORSEY & WHITNEY LLP,** 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendant.

Plaintiff Sorin Group USA, Inc. ("Sorin") brings this action against Defendant St. Jude Medical, S.C., Inc. ("St. Jude") based on St. Jude's hiring of two former Sorin employees – a supervisor, Danna Homan, and a salesperson, John Mitch Tracy. Sorin alleges multiple claims, including tortious interference with contract; tortious interference with prospective economic advantage; inducing, aiding, and abetting a breach of legal duties; and promissory estoppel.

St. Jude now moves for summary judgment on all claims, and Sorin moves to exclude testimony from St. Jude's expert witness, Maria Shepherd. The Court concludes that questions of material fact remain, precluding summary judgment for all of Sorin's

claims except its promissory estoppel claim.  The Court will therefore grant in part and deny in part St. Jude's motion for summary judgment.  The Court also finds that Shepherd is qualified to act as an expert witness, her opinions are neither irrelevant nor unfairly prejudicial, and that Sorin's challenges to the factual basis of her opinions are best addressed on cross-examination.  Accordingly, the Court will deny Sorin's motion to exclude Shepherd's expert testimony.

# BACKGROUND

## I.   FACTUAL BACKGROUND

### A.   Heart Valve Market

St. Jude and Sorin are competitors in the heart valve and related products market. (Decl. of Patrick Chuinard ("Chuinard Decl.") ¶ 3, Oct. 19, 2015, Docket No. 130.)  This case involves two former Sorin employees, Homan and Tracy.  Homan was employed as a Cardiac Surgery Regional Sales Manager at Sorin. (Decl. of Danna Homan ("Homan Decl.") ¶ 1, Oct. 19, 2015, Docket No. 131.)   She left Sorin to work for St. Jude in January 2014.  (*Id.* ¶ 4.)   Tracy worked for Sorin as a sales representative in Central Florida.  (Decl. of John Mitch Tracy ("Tracy Decl.") ¶ 1, Oct. 19, 2015, Docket No. 135; Decl. of Jared B. Briant ("Briant Decl."), Ex. 3 at 36:2-12, Nov. 9, 2015, Docket No. 150.)  In August 2014, Tracy left Sorin to work for St. Jude in Florida.  (Tracy Decl. ¶¶ 1, 9.)

Sorin and St. Jude employ sales representatives to sell their medical devices to hospitals and surgeons; these sales representatives are assigned to geographic territories

and maintain contact with surgeons and hospital staff within their region.  (Decl. of Peter Spadaro ("Spadaro Decl.") ¶ 2, Oct. 19, 2015, Docket No. 134.)   Medical device salespeople typically have close relationships with the many hospital workers involved in heart valve repair or replacement procedures.  (Briant Decl., Ex. 8 ("Gorman Report") at 21.)  A salesperson may even be present in the operating room during a procedure.  (*Id.*)  According to an expert report, "purchasing decisions are ordinarily made in close consultation with the cardiac surgeons who use the heart valve devices, who provide significant input into those decisions."  (*Id.* at 22.)   Additionally, "cardiac surgeons develop long-term use patterns with respect to heart valves and repair products."  (*Id.* at 26.)  In addition to the competing heart valve products, St. Jude also sold a heart failure monitoring device, CardioMEMS; it is undisputed that Sorin does not have any product that directly competes with CardioMEMS.   (Spadaro Decl. ¶ 2; Decl. of JoLynn M. Markison ("Markison Decl."), Ex. 43 at 106:8-22, Oct. 19, 2015, Docket No. 133.)

In recent years, Sorin lost overall market share in part because it was a "low market share player," it did not have a new valve between 2008 and 2014, its competitors offered new types of valves, and it experienced negative press.  (Markison Decl., Ex. 1 at 58:19-64:24.)  Specifically, Sorin faced negative publicity in early 2014 when its valve showed severe degeneration soon after implantation in a child.[1]  (*Id.* at 64:14-24.)  During an April 29, 2014, Sorin conference call, the CEO acknowledged that the

---

[1]  *See, e.g.*, Phil Serafino, *Sorin Falls on Report of Fatal Flaw in Heart Valve*, BloombergBusiness (Jan. 23, 2014, 11:36 AM), http://www.bloomberg.com/news/articles/2014-01-23/sorin-falls-on-report-of-fatal-flaw-in-heart-valve.

company had a "tough quarter" based in part on the negative publicity involving the use of Sorin's valves in young children.  (*Id.*, Ex. 47 at 5-6.)  In July 2014, Boston Children's Hospital published findings of a review of Sorin's uncoated valves, which suggested "early" and "rapid calcification" of Sorin's device in children, (*id.*, Ex. 1 at 64:14-24), and some medical professionals cautioned against implanting the device in young patients.[2]  On August 30, 2014, Sorin's CEO stated that the company faced a "significant challenge" based on the "negative campaign" against the device, called the Mitroflow valve, by competitors trying to discredit it.  (*Id.*, Ex. 48 at 6-7.)  Finally, on February 11, 2015, the CEO again explained the challenges the company faced based on bad publicity and stated, "we have not stopped the bleeding in the US." (*Id.*, Ex. 49 at 13.)

Testimony from former Sorin employees corroborates a decline in morale caused in part by negative press.  (*Id.*, Ex. 6 at 48:6-15; *id.*, Ex. 8 at 21:16-22:1, 24:14-24.) Some employees stated that this decline began in 2014 and that the decline made it difficult to reach sales goals.  (*Id.*, Ex. 8 at 15:13-16:25; 37:21-39:25.)  Other employees cited similar problems occurring much earlier, ranging from 2011 to mid-2013.[3]  Email

---

[2] *See, e.g.*, Candace Stuart, *Surgeons Warn Against Use of Mitroflow Valve in Young Patients*, CardiovascularBusiness (July 1, 2014), http://www.cardiovascularbusiness.com/topics/structural-heart/surgeons-warn-against-use-mitroflow-valve-young-patients.

[3] Scott McCormick, who left Sorin in October 2013, said that there were half a dozen papers before he left – and more after he left – that "defamed the Mitroflow valve and caused concern on the part of the physicians using it."  (Markison Decl., Ex. 9 at 45:13-23.)  His sales representatives had expressed concern to him that articles about Mitroflow were negatively affecting their sales.  (*Id.* at 40:17-23.)  During his last three years at Sorin, McCormick described morale as in decline, "as concerns began to arise and our competitors began to create doubt in the minds of our surgeons . . . there became concern about the clinical performance of

(Footnote continued on next page.)

records suggest that as early as summer 2013, Sorin sales representatives faced concern from surgeons about Sorin heart valves. (*See id.*, Ex. 5.) Several Sorin employees left the company during this time period due to the downturn in sales, lower morale, and questions from surgeons. For example, one employee left Sorin because his "sales were very bad," he "felt that [he] could no longer sell Mitroflow," and he did not want to "lose credibility with [his] surgeons." (*Id.*, Ex. 8 at 45:18-46:15.) Sorin lost twenty-eight sales representatives between January 1, 2012 and March 20, 2015. (*Id.*, Ex. 1 at 95:13-16.)

However, with regard to the Florida market in particular, Sorin estimates that it had a higher-than-average market share in the region, and that Tracy's market share at Tampa General Hospital ("Tampa General"), in particular, was about 45%. (Briant Decl., Ex. 16 at 189:23-191:3.) At the same time, St. Jude was underperforming in portions of Florida. (*Id.*, Ex. 9 at SJM_00002487 (internal email calling North, Central, and Western Florida a "wasteland on THV").) In June 2014 – while Homan worked for St. Jude, and before Tracy left Sorin – Homan stated that some of St. Jude's accounts in Tracy's geographical area were "hemorrhaging," noting that St. Jude was down 56% at that time at Tampa General. (*Id.*, Ex. 15.)

_____

(Footnote continued.)

the valve and concern about the difficulty of being able to sell the valve." (*Id.* at 45:24-46:15.) McCormick suggested that the decline in sales began in 2011. (*Id.* at 41:4-8.)

Another former Sorin employee, Spencer Seibert, who left in mid-2012, called the morale at Sorin "low" and stated that "[t]here was a perception that we, as the sales force, were in this on our own" and that Sorin had no new products or plan to defend its business. (*Id.*, Ex. 7 at 25:21, 54:2-24.) Seibert stated that his sales began to decline in 2011, and that he faced some questions about negative studies before he left in mid-2012. (*Id.* at 27:17-34:8.)

### B.    Homan's Transition to St. Jude

Homan signed an agreement during her employment with Sorin entitled "Inventions, Confidentiality and Non-Compete Agreement," which prohibited her from "directly or indirectly . . . hir[ing] or attempt[ing] to hire any of the Company's employees . . . or attempt[ing] to induce or influence any of the Company's employees . . . to terminate their relationship with the Company" for one year after leaving the company.  (Second Am. Compl. ("Compl."), Ex. A § 5.01(d), Oct. 5, 2015, Docket No. 120.)

In January 2014, Homan accepted a position as Director of Regional Sales, Structural Heart, with St. Jude.  (Homan Decl. ¶ 4.)  Her last day of employment at Sorin was February 14, 2014, and she began working at St. Jude on February 17, 2014.  (*Id.* ¶ 5.)  As a regional director, she was responsible for the southeastern region of the United States.  (*Id.*)

Before extending offers to a "competitive hire," St. Jude typically reviews the applicant's employment agreement and considers potential limitations included therein.  (Markison Decl., Ex. 11 at 40:18-41:25.)    St. Jude's legal and human resources departments reviewed Homan's employment agreement, and Homan's manager, Patrick Chuinard, spoke with St. Jude's managing counsel, Antone Melton-Meaux, and a human resources representative, Jeff Haught, about Homan's restrictions prior to making her an offer.  (Chuinard Decl. ¶¶ 11-12; Markison Decl., Ex. 12 at 84:4-20.)  Chuinard and Haught talked with Homan and "stressed to her that she must comply completely and in

all respects with her obligations to Sorin." (Chuinard Decl. ¶ 13.) Homan "indicated clearly that she understood her obligations to Sorin and further assured [Chuinard] that she would fully comply with such obligations." (*Id.*)

On May 20, 2014, Taylor Pollock, Vice President of Corporate Legal Affairs at Sorin, emailed Melton-Meaux at St. Jude inquiring about Homan. (Markison Decl., Ex. 17.) Pollock described Homan's responsibilities at Sorin and his understanding of her responsibilities at St. Jude, and stated, "It is unclear how, given her noncompete obligations, St. Jude can expect Danna to perform the role of Director, Regional Sales, Structural Heart in what appears to be the same territory she managed for Sorin." (*Id.*) Pollock asked St. Jude to clarify Homan's responsibilities, including her products and territory with St. Jude. (*Id.*)

In response, on June 2, 2014, Melton-Meaux sent Pollock a letter stating, "I can assure that Danna is aware of and will meet her ongoing obligations to Sorin." (Compl., Ex. C.) Melton-Meaux noted that Homan's territory included "North Carolina, South Carolina, Georgia, Kentucky, Tennessee, Alabama, and Florida," and that she was instructed not to service competing products for her prior Sorin accounts, but that she could service noncompeting products for those accounts. (*Id.*) According to Homan, in August 2014, her position changed, and she no longer had any responsibility for Florida; her new territory included Alabama, Georgia, and Tennessee. (Homan Decl. ¶ 5; Markison Decl., Ex. 15 at 335:18-24.)

### C.      Tracy's Recruitment

Tracy previously applied for employment at St. Jude in 2011; however, no agreement was reached and Tracy did not join St. Jude.  (Chuinard Decl. ¶ 15; Spadaro Decl. ¶ 3.)  During his employment at Sorin, Tracy signed an agreement that provided as follows:

> For a period of one (1) year following the termination of this Agreement for any reason, Employee shall not, **directly or indirectly**, do any of the following:
>
> (a) **Solicit or divert or accept business relating in any manner to Conflicting Products** with any actual or potential clients or customers of the Company with respect to whom Employee, or anyone under Employee's supervision, had contact during the twelve (12) months preceding termination of this Agreement . . . .

(Compl., Ex. B, § 5.02(a) (emphasis added).)

The parties tell significantly different stories about Tracy's 2014 recruitment. St. Jude relies on Tracy and Homan's testimony and declarations, in which they state that Tracy pursued employment at St. Jude and elsewhere, and that Homan did not have significant involvement in Tracy's decision to leave Sorin for St. Jude.  According to Tracy, he "began reaching out to [St. Jude], through Danna Homan (who had been [his] supervisor at Sorin), about the possibility of joining" St. Jude in early 2014.  (Tracy Decl. ¶ 2; Markison Decl., Ex. 18 at 184:7-8.)  According to Homan, Tracy had been "pinging [her] for months and months to come over."  (Markison Decl., Ex. 15 at 340:14-25.) Homan claims that when Tracy initially reached out to her there was an open position in North Florida, but that she "did not encourage [St. Jude] to hire or even talk to Mr. Tracy

about that position." (Homan Decl. ¶ 7.) Instead, she claims that she recommended another individual for the position. (*Id.*)

According to Homan, in spring of 2014, Tracy learned that a St. Jude sales representative vacancy opened in Central/West Florida and he began contacting her about it. (*Id.* ¶ 8.) According to Tracy, he was determined to leave Sorin and "had already applied for open sales positions at three other companies (Edwards Life Sciences, Heartware, and Intuitive) prior to applying at [St. Jude]." (Tracy Decl. ¶ 5.) Homan states that Tracy connected with her in May of 2014 to discuss the open position, but she referred him to Chuinard, who was responsible for the position. (Homan Decl. ¶ 8-9.) She "assisted Mr. Chuinard in setting up interviews with the two candidates . . . one of whom was Mr. Tracy" and the other of whom "did not work for Sorin." (*Id.* ¶ 9.) She claims that she did not have authority to "hire" Tracy because "only a Vice President or higher had the authority to do so." (*Id.* ¶ 10.) She claims that after the decision to hire Tracy was made, she participated in the discussions regarding terms of the offer, but that she "was nothing more than the liaison between the hiring authority and Mr. Tracy." (*Id.* ¶ 11.) At most, Homan acknowledges that she "did encourage [St. Jude] to hire a competitive sales representative as part of a growth strategy, which is standard practice at medical device companies." (*Id.* ¶ 12.) She claims that "Mitch was going to St. Jude whether [she] passed this information along or not. [She] was the postman between [Tracy] and the hiring authority." (Markison Decl., Ex. 15 at 287:5-9.) St. Jude contends that Tracy was hired to act as a Heart Failure Specialist, selling CardioMEMS during his non-compete period. (*Id.*, Exs. 37-38, 40.)

Sorin, on the other hand, relies on contemporaneous documentary evidence, which suggests that Homan considered bringing Tracy over to St. Jude very early on in her employment with St. Jude and that she was an active participant in his hiring. On February 19, 2014, Homan's third day at work, she emailed Chuinard her analysis of the present situation in Florida and her suggestions to "maximize [St. Jude's] opportunity in the state." (Briant Decl., Ex. 20 at SJM_00001571.) Her proposal named two Sorin employees in the region – Tracy and Scott Cart – and their biggest accounts in 2013, which she described as "key opportunities to convert share to [St. Jude]." (*Id.*) Homan made the following suggestion:

> To restructure Florida with 4 HV reps, I propose hiring Mitch Tracy and Scott Cart with the anticipated ***share gain opportunity of approximately 3.5 million***. I propose that [St. Jude] allow Mitch to work in Scott Cart's 2013 alignments for 12 months, and Scott work in Mitch's 2013 alignments for 12 months. They each have strong relationships with the physicians in the other territory, and this would avoid any non-compete issues.

(*Id.*) Homan also proposed a "Plan B," which did not include Tracy, but still included Cart, stating "[t]his scenario would not include Mitch Tracy with the ability to covert that share." (*Id.* at SJM_00001572.)

Homan was still considering hiring Tracy in March 2014, when she emailed Chuinard with two options. The first option included promoting from within to fill the North Florida opening and hiring someone from another company for the other opening. (*Id.*, Ex. 21.) The second option involved hiring Tracy, about whom Homan stated, "Current Sorin rep in Tampa. Knows all the docs. Easy gain of ~$1.5-2 million in competitive biz." (*Id.*) This plan also involved hiring Cart for another opening, saying

"Adds 2 VERY skilled, credible and proven valve reps to our team." (*Id.*)  At the end of the email, Homan stated, "Great problem to have… exciting. But I have to pick!!!!!!"[4] (*Id.*)

Homan was involved in scheduling Tracy's interview with Chuinard and in negotiating the terms of his offer.  On May 27, 2014, Homan texted Tracy asking if he would "be willing to fly to Dallas next [Monday] or [Tuesday] to interview with [Chuinard]? Please?" (*Id.*, Ex. 27.)  Homan then emailed Chuinard on May 29, 2014, suggesting that he meet with Tracy and offering his cell phone and email address. (*Id.*, Ex. 28.)  Chuinard interviewed both Tracy and another candidate on June 6, 2014. (*Id.*, Ex. 29.)  Homan and Tracy engaged in a series of text messages on June 25, 2014, discussing salary and whether he would be willing to switch to St. Jude. (*Id.*, Ex. 36.)  During the exchange Homan asked Tracy if he would consider $275,000, and Tracy lobbied for $300,000 or a sign-on bonus. (*Id.*)  Homan asked to Tracy "how much can I say [you] can bring over?" (*Id.* at TRACY_00000015.)  Tracy said "[h]elp me help [yo]u." (*Id.* at TRACY_00000016.)  Homan responded that she was trying and that she needed him; Tracy responded that he had "faith" and "[e]verything will work out." (*Id.* at TRACY_00000017, TRACY_00000018.)

In a June 26, 2014, email to Chuinard, Homan again lobbied to hire Tracy for the Florida region, claiming that "he will transition $800k-$1 million within his first year."

---

[4] In his deposition, Chuinard acknowledged this statement, but stated "the decision to, as she says here, pick, is the responsibility of the hiring manager . . . Joel Becker. So for a territory manager position, which we're referring to here, I am the hiring manager, so that would be my decision." (Markison Decl., Ex. 19 at 95:21-96:8.)

(*Id.*, Ex. 22.)  She stated that she would "like to offer the $275 if possible" because she thought he could justify it within 12 months.  (*Id.*)  She also thanked Chuinard "for helping [her] make this work." (*Id.*)  Chuinard replied the same day, saying he supported Homan's "well-thought out plan." (*Id.*)

In July 2014, Peter Spadaro took over Chuinard's responsibilities in the region. (Chuinard Decl. ¶ 21.)  In a July 2014 email, Homan again expressed support for hiring Tracy, telling Spadaro, "Remember Mitch Tracy that you and Gar tried to hire a few years ago? Well, I managed him back then at Sorin and now he's ready to come over. [Chuinard] gave the thumbs up and we're waiting on his paperwork in house." (Briant Decl., Ex. 23.)  She stated that the paperwork was "stalled for some reason," and she asked for Spadaro's help to speed up the process because she wanted Tracy to attend a region meeting in two weeks.  (*Id.*)

Also in July 2014, one of St. Jude's recruiters emailed Homan with Tracy's paperwork, telling her to have Tracy review and sign it.  (*Id.*, Ex. 24 at SJM_00000699.) Homan then emailed Spadaro telling him that Tracy was "motivated about taking the offer and joining [St. Jude]"; however, she stated that because he could not work his territory during the non-compete period, he wanted a two-year guarantee.  (*Id.* at SJM_00000698.)  She asked for his approval to accept this condition.  (*Id.*)  Spadaro then forwarded the request to two others, stating "This hire is a linchpin to reversing our low THV share in Florida . . . . I tried to recruit Mitch 4 years ago and he is the real deal and will move business and provide credibility." (*Id.*)  After receiving approval, Homan emailed Spadaro stating, "Just spoke to Mitch and he will sign as soon as we get that to

him . . . .   Thank you so much for the support!"   (*Id.* at SJM_00000697.)   Tracy signed

his offer letter on July 23, 2014.  (Markison Decl., Ex. 25 at SJM_00002914.)

Homan was listed as Tracy's supervisor in his offer letter.  (*Id.* at SJM_00002912.)

Homan also received an email from a recruitment coordinator asking for her feedback on

Tracy's recruitment process.  The email read:  "Recently you hired John [Mitch] Tracy

for the Territory Manager, Structural Heart position."  (Briant Decl., Ex. 37.)   Around

August 7-8, 2014, in a presentation Homan gave about her region, her tactical plan for

Tampa General was "Competitive Hire to convert business."   (*Id.*, Ex. 25 at

SJM_00002137.)  She also suggested in her presentation that the addition of Tracy would

result in "$800k-$1.2 million over 12-18 mo[nths]."  (*Id.* at SJM_00002138.)

### D.    Tracy's Actions Before Leaving Sorin

Prior to hiring Tracy, St. Jude's legal department reviewed Tracy's agreement

with Sorin.  (Markison Decl., Ex. 20; *id.*, Ex. 21.)   St. Jude recognized Tracy's non-

compete, and in July 2014, Homan stated, "In [Tracy's] offer, we will need to asterisk his

non-compete accounts that we will be recognizing for 12 [months].   During this time, I

will have other reps from my region cross covering."   (*Id.*, Ex. 22.)   Homan also

requested a two year guarantee because "[Tracy] cannot work his existing territory for 12

[months]."  (*Id.*, Ex. 23 at SJM_00000524.)

The day of his interview with Chuinard, June 6, 2014, Tracy had drinks with

Dr. Chris Caldeira, a surgeon from Tampa General.   (Briant Decl., Ex. 30 at

SORIN0005195, SORIN0005201; *id.*, Ex. 12 at 390:22-391:13.)  Tracy submitted at least

$3,695.60 in expenses for meals with medical professionals from his non-compete accounts – the majority of which were for Tampa General – between the time he interviewed with St. Jude and his final day at Sorin. (*Id.*, Ex. 38; *id.*, Ex. 30; *id.*, Ex. 4 at 275:18-290:25.) At the same time, Tracy did not sell a single Sorin heart valve at Tampa General in June 2014 and only sold one in July 2014, a clear downturn from his past sales. (*Id.*, Ex. 39.) On August 5, 2014, Homan said in an email "[t]he competitive rep I just hired has a strong share of valve and repair biz at [Tampa General], and the surgeons have committed to switch to [St. Jude]." (*Id.*, Ex. 47.)

On July 30, 2014, Homan sent Tracy a text stating that Spadaro told her to encourage him "'not' to give two weeks' notice" because Sorin had wanted a prior employee "to work the two weeks so they could find legal loopholes to keep him." (*Id.*, Ex. 45.) This was confirmed by a July 31 email in which Spadaro asked Homan if Tracy was resigning that day and said, "I don't want him giving 2 weeks." (*Id.*, Ex. 46.)

Tracy began training for St. Jude while still employed at Sorin.  On August 5, 2014, Tracy stated in a text message that he would give notice the next day, and that he had "[s]tarted on assigned training courses" and would have them completed within the week. (*Id.*, Ex. 48 at TRACY_00000080.)  The next day Tracy sent a text message stating that he was "finishing all [his] benefits, drug screen, and computer learning modules this week . . . . Then [he was] going to set up some days in the field and also get around to [his] surgeons to tell." (*Id.*, Ex. 49.)  When asked about this message, Tracy suggested that he likely meant he was going to tell cardiothoracic surgeons, including

Dr. Caldeira, that he was switching companies.  (*Id.*, Ex. 4 at 262:20-263:15.)  Tracy completed St. Jude's training on August 12.  (*Id.*, Ex. 50.)

Tracy gave notice of his resignation to Sorin on August 7, 2014.  (*Id.*, Ex. 43.) However, his termination was not effective until August 15, 2015.  (*Id.*, Ex. 5.) According to St. Jude, Tracy did not start working there until August 18, 2015. (Markison Decl., Ex. 12 at 75:13-16; *id.*, Ex. 26.)  However, on August 13, Tracy met with Dr. Caldeira on St. Jude's behalf.  (Briant Decl., Ex. 51.)  Then on August 14, Tracy sent a text to Homan stating "First implant today.  Mitral mechanical Tgh."  (*Id.*, Ex. 53 at TRACY_00000152.)  At his deposition, Tracy acknowledged that, while he did not remember this particular message, "Tgh" would mean Tampa General Hospital, "Mitral mechanical" would be in reference to a mitral mechanical valve, and that a mitral mechanical valve would compete with a valve he sold at Sorin.  (*Id.*, Ex. 4 at 317:3-17.) When asked whether this message meant that he was personally involved in the implantation of a St. Jude valve on that date, he said that it did not; rather, he claimed that the message likely meant that somebody told him that they used a mitral mechanical valve.  (*Id.* at 317:18-25.)  Homan responded to the message by saying "U think you're something don't u?" and then "[Tampa General] one of the Area's top 'loss' accounts. YOU are the lethal weapon!"  (*Id.*, Ex. 53 at TRACY_00000153, TRACY_00000154.)

### E.    Tracy's Actions After Leaving Sorin

Some internal documents suggest that Tracy acted as a heart valve representative for St. Jude in Florida and at Tampa General in particular.  In an August 26, 2014, email

Homan stated that there were "inventory issues" after a prior employee left, and that Tracy "picked up that ball and started running with it.  He's working closely with customer [service] to insure that everything is as it should be and customers are happy. THANK GOODNESS FOR MITCH – he already knows the key players so it's a seamless transition."  (*Id.*, Ex. 58.)  On September 2, 2014, the Regional Sales Manager at St. Jude introduced Tracy as "our new valve rep in [Tampa General]."  (*Id.*, Ex. 55 at SJM_00001628.)  This same email chain suggested that Tracy was working with heart valves at Tampa General.  Tracy initially sent an email on September 2, 2014, asking to trade out expired valves, which were then identified as belonging to Tampa General.  (*Id.* at SJM_00001629, SJM_00001630)  The manager also said Tracy was "cleaning up a mess."  (*Id.* at SJM_00001628)  Tracy responded that the valves should be swapped out "ASAP," stating about Tampa General, "If they go to use one of these and it's not available [it] would not look good.  Based on previous dealings it's almost an expectation from them.  High maintenance account."  (*Id.*)  In a September 9, 2014, email with "Tampa Team" in the subject line, the same manager again referred to Tracy as "our new valve rep" and noted that Tracy had "some strong connections in the BayCare system as well as at [Tampa General]."  (*Id.*, Ex. 56.)  In St. Jude's financial database, Tracy was listed as the responsible representative for St. Jude mechanical heart valves at Tampa General.  (*Id.*, Ex. 57 at SJM_00001874.)  Also, on September 4, 2014, Tracy stated in a text message, "I told Caldeira no to Sorin. They are being asshes [sic] about me leaving." (*Id.*, Ex. 54.)

St. Jude has provided some internal documents that suggest that St. Jude intended to honor Tracy's non-compete; however, aside from documents relating to Tracy's official job title and business cards, they all come from communications made **after** the present action was filed on September 26, 2014.  The earliest example provided is a September 28, 2014, email in which Tracy's manager, Shayne Macherowski, said of Tracy, "Mitch just started with us and had to clear a bunch of expired shelf stock, respect his non-compete and start training."  (Markison Decl., Ex. 27.)  The others range from October 3, 2014, to March 2015, (*see id.*, Exs. 29-36), and some suggest that many members of the company initially were unaware that Tracy was barred from making certain sales.  For example, on October 3, 2015, Macherowski responded to an email from another St. Jude employee by stating, "Tracy is currently on a noncompete.  He has nothing to do with valves for a period of one year and [sic] his former territory.  Fernando Acuna and I have **taken over responsibility** so kindly email all future emails to Fernando and myself, not to Mitch."  (*Id.*, Ex. 28 (emphasis added).)

St. Jude created a new job title for Tracy, "Heart Failure Sales Specialist," which did not appear in the "global job catalog."  (Briant Decl., Ex. 74 at SJM_00001403, SJM_00001404.)  When Spadaro was asked about the job title in an email by another employee, he asked to discuss the matter over the phone, and the person he talked to then stated in an email that it "is a work around for what they are trying to accomplish while Mitch is on the guarantee for the next 2 years."  (*Id.*)  On September 12, 2014, Macherowski emailed asking about Tracy's business cards, and stated that they must say

"Heart Failure Specialist" because Tracy "needs these in order to be able to get around. His former employer and manager are trying to make his life challenging." (*Id.*, Ex. 75.)

### F.      Tampa General RFP

On September 26, 2014, Tampa General sent out a Request for Proposal ("RFP") allowing companies to bid to be one of two vendors in a two-year mechanical and biologics valve agreement, which would involve 90% of Tampa General's valve business. (*Id.*, Ex. 61.) That same day, Tracy emailed Spadaro and Macherowski stating "This is a must win.  I will speak with appropriate parties to get more insight at [Tampa General]." (*Id.*, Ex. 62.) On September 30, 2014, Spadaro forwarded Tracy's message to Fernando Acuna, stating "pls discuss w Mitch.  This is due Oct 17… we need to tie this in w Cmems." (*Id.*, Ex. 63.) Acuna sent an email on October 7 entitled "TGH new Valve agreement," to which Spadaro responded "looks good…Mitch, please discuss tactical approach w[ith Macherowski]….I am back in Tampa week of 10-27 so we can visit then and spend some time at [Tampa General]." (*Id.*, Ex. 65.)

On October 15, 2014, two days before St. Jude's Tampa General proposal was due, Tracy met with Dr. Caldeira.  (*Id.*, Ex. 51; *id.*, Ex. 67.)  The next day, Tracy sent a text message saying, "Had great dinner with Dr Caldeira last night with a possible follow up next week with [Spadaro] and yourself if available.  Have a plan for Port Chsrlotte [sic] as well with his help." (*Id.*, Ex. 69.)  In an October 29, 2014, email Dr. Caldeira is listed as an "advocate" for "Structural Heart-Valve proposal for dual vendor" at Tampa General.  (*Id.*, Ex. 66.)  On December 2, 2014, Acuna forwarded St. Jude's RFP response

to Tracy's personal email.  (*Id.*, Ex. 70 at SJM_00003668.)   Acuna and Macherowski were supposed to attend a meeting at that time with Tampa General about the response to the RFP.  (*Id.*, Ex. 52 at 208:20-209:14.)  St. Jude was selected as one of the dual vendors at Tampa General "based on Physician Preference and pricing."   (*Id.*, Ex. 71 at SORIN0003973.)  Sorin also submitted a proposal, but was not selected.  (*Id.*)

After Tracy left Sorin, a dispute arose between Chad Randall, the Sorin employee who took over working with Tampa General after Tracy left, and Patricia Cedrone, the charge nurse of Tampa General's cardiovascular operating room.   Randall stated that when he was unwilling to give free exchanges of expired product, Cedrone was "infuriated" and told him that "Mitch had always previously taken care of this for us" and that she would "ensure that [Randall] was not part of the RFP."  (Markison Decl., Ex. 44 at 166:11-15, 170:4-171:20.)

### G.    Sorin's Sales in Central Florida

According to Sorin, it has only sold six heart valves at Tampa General since Tracy's interview with St. Jude in June 2014.[5]  (*See* Briant Decl., Ex. 39.)  Sorin's expert, Donald Gorowsky, estimated that Sorin's lost profits amounted to $1,036,407.  (*Id.*, Ex. 7

---

[5] Sorin has provided a chart showing heart valve sales by customer account between January 1, 2011, and June 30, 2015, which suggests a steep drop in sales.  (*See* Briant Decl., Ex. 39.)   While Sorin's sales at Tampa General fluctuated during the entire period – dropping below $8,000 in February 2013 and June 2013 – they drop off tremendously in June 2014.  (*Id.*) In June 2014, Sorin reported no sales for the first time during the period.  (*Id.*)  After just $3,777 in July 2014, Sorin again reported no sales in August, September, and October 2014.   (*Id.*) Sorin's sales did not significantly recover thereafter, with no sales in January 2015 or March through June 2015.  (*Id.*)

at 36.)  While at Sorin, Tracy was responsible for sixteen hospital accounts in Western Florida, and 91% of his sales were at eight of those hospitals.  (*Id.* at 42.)  Gorowsky's analysis shows that Sorin's sales at five of Tracy's eight primary accounts continued in line with their historical trend.  (*Id.*)  However, Sorin's sales at three of Tracy's primary accounts – Tampa General, Sarasota Memorial, and Tampa VA – were significantly lower between June 2014 and June 2015 than in prior years.  (*Id.*)  Specifically, sales at Tampa General totaled over $300,000 each year between June 2011 and May 2014, but then dropped to just $14,815 between June 2014 and June 2015.  (*Id.*)

## H.     Dr. Caldeira and Dr. Jimenez

With its motion for summary judgment, St. Jude submitted declarations from Dr. Caldeira and Dr. Ernesto Jimenez, a cardiac surgeon at Tampa VA.[6]  Dr. Caldeira stated that Tracy never solicited his business for St. Jude during the non-compete period

---

[6] Sorin argues that the Court should not consider these declarations because fact discovery is closed and St. Jude did not identify Dr. Caldeira or Dr. Jimenez as witnesses in its Rule 26(a)(1) disclosures or supplemental disclosures.  *See Troknya v. Cleveland Chiropractic Clinic*, 280 F.3d 1200, 1205 (8th Cir. 2002) (upholding a district court's exclusion of witnesses not formally disclosed under Rule 26 even if they were "identified or referenced somewhere in the course of discovery").  However, even if St. Jude should have disclosed Dr. Caldeira and Dr. Jimenez as witnesses, they need not be excluded if the failure was "substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Here, Sorin was aware that Dr. Caldeira and Dr. Jimenez may have discoverable information, and there is no indication that St. Jude withheld the undisclosed witnesses in bad faith; therefore, the Court will consider the declarations.  *See Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004) (allowing undisclosed witness because there was no unfair surprise where plaintiff had knowledge of the witness and defendant did not find out about the witness until later); *Bergfeld v. Unimin Corp.*, 319 F.3d 350, 355 (8th Cir. 2003) (finding that "'[t]he 'use of an undisclosed witness should seldom be barred unless bad faith is involved'" (quoting *Mawby v. United States*, 999 F.2d 1252, 1254 (8th Cir. 1993))).  Of course, while the Court will consider the declarations, it need not accept them as true and will consider competing evidence.

and never told him to stop using Sorin products. (Decl. of Dr. Christian C. Caldeira ("Caldeira Decl.") ¶ 2, Oct. 19, 2015, Docket No. 129.) Dr. Caldeira also stated that Tracy never spoke with him about the Tampa General RFP, and that he stopped using Sorin products because of safety concerns. (*Id.* ¶¶ 4, 7.) Dr. Jimenez stated that Tracy only discussed CardioMEMS during his non-compete period and did not solicit his business on behalf of St. Jude. (Decl. of Dr. Ernesto Jimenez ("Jimenez Decl.") ¶¶ 1-3, Oct. 19, 2015, Docket No. 132.)

## II.   PROCEDURAL BACKGROUND

Sorin brought this action on September 26, 2014, alleging (1) tortious interference with contract based on Homan's and Tracy's non-compete agreements; (2) inducing, aiding, and abetting breach of legal duties; (3) unjust enrichment; and (4) promissory estoppel. The complaint was later amended to include a claim for tortious interference with prospective economic advantage. On October 5, 2015, the complaint was amended a second time to add a request for punitive damages. Because this case is in federal court due to diversity jurisdiction, in order to add punitive damages to its claim, Sorin had to seek leave to amend under Minn. Stat. § 549.191. United States Magistrate Judge Jeffrey J. Keyes reviewed Sorin's motion and allowed Sorin to add punitive damages.[7] (*See* Order, Sept. 28, 2015, Docket No. 114.)

---

[7] Sorin argues that the summary judgment standard found in Rule 56 cannot be met in St. Jude's favor based on the prior decision by United States Magistrate Judge Keyes. The Magistrate Judge's ruling was based on the unique context of a motion to amend to add punitive damages. The Magistrate Judge stated the applicable standard as "whether the plaintiff's

(Footnote continued on next page.)

On August 20, 2015, St. Jude moved for summary judgment on all claims.  In its response, Sorin informed the Court that it would no longer pursue its unjust enrichment claim and its aiding and abetting claim based on Homan's alleged breach of legal duties; accordingly, those claims will be dismissed.  (*See* Briant Decl., Ex. 1; Pl.'s Mem. in Opp'n at 3 n.1, Nov. 9, 2015, Docket No. 149.)  On October 19, 2015, Sorin moved to exclude the expert testimony of Maria Shepherd.

## ANALYSIS

## I.      MOTION FOR SUMMARY JUDGMENT

### A.      Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

_____

(Footnote continued.)

evidence, if unrebutted, clearly and convincingly allows a conclusion that a defendant (1) was aware of, or intentionally disregarded, facts that make injury to the plaintiff's rights highly probable and (2) took action despite such knowledge." (*Id.* at 2.)  Thus, the Court looked only at Sorin's evidence, and did not consider St. Jude's evidence or make any credibility determinations.  (*Id.* at 12.)  Additionally, the Magistrate Judge  only considered whether Sorin had provided sufficient evidence to support punitive damages, which required that St. Jude knew of Sorin's employment contracts and that they prohibited certain conduct, and that St. Jude engaged in conduct that had a high probability of harming Sorin's rights.  (*See id.* at 3.)  Accordingly, while much of the same evidence is relevant to both inquiries, they are distinct.  The Magistrate Judge's decision would not bar a summary judgment finding in light of the different evidence considered and the procedural context.

248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

### B.    Causation and Damages

First, St. Jude argues that Sorin's claims must be dismissed because it has not established causation and damages.  A showing of damages caused by St. Jude's wrongful conduct is necessary for all of Sorin's claims.[8]  St. Jude argues that Sorin has

---

[8] *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014) (requiring causation and damages for a tortious interference with prospective economic advantage claim); *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000) (finding that a promissory estoppel claim requires that the promise induced reliance and that the plaintiff actually relied to its detriment); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999) (finding that causation and damages are elements of an aiding and abetting breach of legal duties claim); *Bebo v. Delander*, 632 N.W.2d 732, 738 (Minn. Ct. App. 2001) (finding that one element of a tortious interference with contract claim is that there were "damages caused by the breach").

not produced evidence that Sorin would have sold more valves at Tampa General or Tampa VA but for St. Jude's allegedly wrongful actions.  St. Jude essentially argues that there is no evidence that Homan or Tracy sold St. Jude heart valves to either of these accounts, or that Tampa General would have selected Sorin in response to the RFP, without St. Jude's wrongful conduct.  To support these contentions, St. Jude relies heavily on declarations from Dr. Caldeira and Dr. Jimenez as well as declarations from Tracy and Homan themselves.

However, the contemporaneous paper trail tells a different story.  First, the fact that the timing of Sorin's decline in sales to Tampa General coincided with Tracy's recruitment at St. Jude suggests that Tracy may have stopped trying to sell Sorin products while still employed at Sorin.  (*See* Briant Decl., Ex. 7 at 42; *id.*, Ex. 39.)  Second, Sorin has put forward evidence that when viewed together could show an effort by Tracy to convert Tampa General's business to St. Jude.  For example, between the date of his interview and his final day at Sorin, Tracy submitted over $3,000 in expenses for meetings with medical professionals, the majority of which related to Tampa General.  (*Id.*, Ex. 38; *id.*, Ex. 30; *id.*, Ex. 4 at 275:18-290:25.)  However, during that same time period, Tracy sold only one heart valve at Tampa General, which is a significant downturn from his usual sales.  (*Id.*, Ex. 39.)  Overall, these pieces of evidence, among others, create a fact issue regarding Sorin's lost sales at Tampa General.

With regard to the RFP, St. Jude argues that Tracy had no involvement in St. Jude's bid, and therefore, St. Jude could not have caused Sorin to lose the Tampa General RFP.  However, one reasonable reading of the facts is that Tracy brought over

Dr. Caldeira, who then became St. Jude's "advocate" during the RFP process, even if Tracy was not directly involved in the RFP.  (*Id.*, Ex. 66.)  Tracy's connection with Dr. Caldeira and Homan's statement that "the surgeons have committed to switch to [St. Jude]," (*id.*, Ex. 47), suggest that Tracy may have influenced the RFP process even prior to the formal bids.  Tampa General's decision based on "Physician Preference and pricing" similarly shows that the physicians were involved in the decision.  (*Id.*, Ex. 71 at SORIN0003973.)

In addition, the evidence does not conclusively establish that Tracy had no involvement in the RFP.  After receiving the RFP, Tracy stated, "This is a must win. I will speak with appropriate parties to get more insight at [Tampa General]."  (Briant Decl., Ex. 62.)  Although St. Jude contends that another salesperson, Fernando Acuna, handled the Tampa General RFP, Spadaro directed Acuna to discuss the RFP with Tracy.  (*Id.*, Ex. 63.)  Tracy also had dinner with Dr. Caldeira two days before St. Jude's proposal was due.  (*Id.*, Ex. 67.)  And, in response to Acuna's email including St. Jude's proposed agreement, Spadaro told Tracy to "discuss tactical approach" with Macherowski.  (*Id.*, Ex. 65.)  Viewing this evidence in the light most favorable to Sorin, these contemporaneous documents, along with other evidence, establish a genuine and material factual dispute over whether Tracy was involved in the RFP process.

St. Jude also contends that Sorin would not have won the RFP even without any alleged wrongful conduct.  St. Jude highlights the dispute between Tracy's replacement, Randall, and the charge nurse of Tampa General's cardiovascular operating room.  In that encounter, the charge nurse was upset with Randall's conduct and stated, in part, that

"Mitch [Tracy] had always previously taken care of this for us" and she would "ensure that [Randall was] not a part of the RFP . . . if [she had] any say in [it]."  (Markison Decl., Ex. 44 at 171:10-20.)  Tracy himself referred to Tampa General as a "[h]igh maintenance account."  (Briant Decl., Ex. 55.)  While this may be persuasive evidence, it does not foreclose other inferences.  St. Jude also contends that even if Tracy was involved with the RFP, he did so only to sell CardioMEMS, which does not compete with any Sorin product.  However, considering the other evidence in this case – suggesting a plan of converting business – a fact issue remains over the nature of Tracy's involvement with the RFP.  It is not entirely clear at this stage whether Sorin could have won the RFP if Tracy had continued working at Sorin or if he had not gone to a competitor in the same region.

Overall, viewing the facts in the light most favorable to Sorin and making all reasonable inferences in Sorin's favor, a genuine issue of material fact remains over whether St. Jude's actions caused Sorin's damages.

### C.     Tortious Interference with Contract

Generally, a cause of action for tortious interference with a contract requires: (1) the existence of a contract between the parties, (2) the defendant's knowledge of the contract, (3) the defendant intentionally procured its breach, (4) without justification, and (5) damages.  *Kallok v. Medtronic, Inc.*, 573 N.W.2d. 356, 362 (Minn. 1998).  St. Jude acknowledges that Homan and Tracy entered into employment agreements with Sorin, and that it had knowledge of the agreements; thus, the dispute centers on whether St. Jude

intentionally procured a breach of those contracts, and as discussed above with relation to all claims, whether Sorin has established damages due to a breach.

### 1.   Homan's Agreement[9]

St. Jude contends that Homan's employment agreement only prevented her from "hir[ing] or attempt[ing] to hire" Sorin employees, but not from having "any involvement in" the hiring of Sorin employees.  Accordingly, St. Jude argues that Sorin has not shown evidence that Homan breached the agreement because she did not have authority to hire and did not actually hire Tracy.  The employment agreement, however, prohibits hiring or attempting to hire both directly or indirectly.  Here, there is some evidence suggesting that Homan did "hire" Tracy herself, such as her messages saying that she hired him and the recruitment email asking about her hiring experience.  (Briant Decl., Ex. 37; *id.*, Ex. 47.)  However, Sorin can also maintain its claim by showing that Homan indirectly hired or induced Tracy to leave.  In this case, there is evidence suggesting that Homan played a significant role in Tracy's resignation from Sorin and his hiring at St. Jude.  In particular, as discussed more thoroughly in the fact section, Homan suggested hiring Tracy immediately after she started employment with St. Jude; she was involved throughout his hiring process, including setting up his interview; and she negotiated his salary.  (*See id.*, Exs. 20, 27, 36.)  Overall, the documentary evidence relied on by Sorin

---

[9] While Sorin initially alleged other bases for breaches of Homan's contract – including dual employment, influencing another employee to leave Sorin, and selling heart valve products to restricted accounts – Sorin now only argues for a breach of Homan's agreement based on her role in hiring Tracy.  Accordingly, only a claim based on Tracy's hiring will be discussed here.

establishes a fact issue over whether Homan breached her agreement with Sorin due to her involvement in Tracy's hiring at St. Jude.

St. Jude briefly argues that even if Homan individually breached her agreement, St. Jude did not induce or intentionally procure the breach. The evidence suggests, however, that Homan shared her proposal to recruit Tracy with Chuinard and other management employees. (*Id.*, Exs. 20-22, 25.) Spadaro also endorsed the plan, stating that Tracy was the "linchpin to reversing [St. Jude's] low THV share in Florida." (*Id.*, Ex. 24 at SJM_00000698.) St. Jude's management appears to have allowed and helped Homan hire Tracy, and therefore, there is an unresolved factual dispute regarding whether St. Jude induced or intentionally procured her breach of contract.

### 2.     Tracy's Agreement

St. Jude also contends that Sorin cannot show that it tortuously interfered with Tracy's employment agreement because Tracy did not compete with Sorin by selling to his prior customers. Again, St. Jude is reading Tracy's agreement too narrowly. The contract did not merely prohibit actual sales to Tracy's former customers, but more generally, it prohibited Tracy from "directly or indirectly . . . [s]olicit[ing] or divert[ing] or accept[ing] business relating in any manner to Conflicting Products" with regard to his prior customers. (Compl., Ex. B, § 5.02(a).)

St. Jude contends that there is no evidence that Tracy was dually employed or that he solicited or diverted business while still employed or during his non-compete period. However, there is sufficient evidence that, when viewed in the light most favorable to

Sorin, establishes a fact issue over whether Tracy began diverting customers while still employed at Sorin. The strongest evidence includes: Tracy's meetings with healthcare workers after interviewing with St. Jude, while his sales dropped significantly, (*see* Briant Decl., Exs. 38-39), and Homan's email before Tracy left Sorin, stating that "surgeons have committed to switch to [St. Jude]," (*id.*, Ex. 47). Additionally, some evidence suggests that Tracy continued to divert sales from Sorin after he began working at St. Jude. For example, Tracy stated on September 4, 2014, that he "told Caldeira no to Sorin. They are being asshes [sic] about me leaving." (*Id.*, Ex. 54.)

Sorin has also produced sufficient evidence to establish a genuine factual dispute regarding whether St. Jude induced Tracy to breach his contract. The evidence suggests that Tracy was meant to convert business quickly upon his move to St. Jude. (*See id.*, Ex. 25 at SJM_00002138 (suggesting that Tracy would result in "$800k-$1.2 million over 12-18 mo[nths]").) There is also evidence suggesting that St. Jude viewed Tracy as a heart valve representative, including the representative to Tampa General, before this lawsuit was filed. (*See, e.g.*, *id.*, Ex. 55 at SJM_00001628 (referring to Tracy as "our new valve rep in [Tampa General]"); *id.*, Ex. 56 (referring to Tracy as "our new valve rep" and noting his strong connections at Tampa General).) Overall, the Court will deny St. Jude's motion with regard to Sorin's tortious interference with contract claim because genuine issues of material fact remain.

**D.      Aiding and Abetting Breach of Legal Duties**

To establish a claim for aiding and abetting tortious conduct of another: "(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).  Here, Sorin bases its claim on Tracy's actions to convert Sorin's customers while still employed at Sorin, in breach of his duty of loyalty.   Under Minnesota law, "an employee owes his employer a duty of loyalty which prohibits him from soliciting the employer's customers for himself, or from otherwise competing with his employer, while he is still employed." *Eaton Corp. v. Giere*, 971 F.2d 136, 141 (8th Cir. 1992).

St. Jude first argues that this claim fails because Tracy did not commit an underlying tort.  While employees may not compete with their employers while still employed, they may prepare to compete with them.  *See Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. 1987).  St. Jude cites *Signergy Sign Grp., Inc. v. Adam*, which found no claim for breach of a duty of loyalty without evidence of direct solicitation of the employer's customers or direct competition with the employer during employment.  Nos. A04-70, A04-147, 2004 WL 2711312, at *2 (Minn. Ct. App. Nov. 30, 2004).  However, the duty of loyalty extends beyond direct competition while employed. In *Cenveo Corp. v. Southern Graphic Systems, Inc.*, the court applied Minnesota law and found that a reasonable factfinder could conclude that supplying a competitor with

information about the salaries of coworkers, types of equipment necessary for a client, and timing to capture an account amounted to a breach of loyalty. 784 F. Supp. 2d 1130, 1137 (D. Minn. 2011). Whether an employee's actions cross the line from permissible preparation to prohibited solicitation "is a matter of degree . . . to be determined based on all the circumstances of the case." *Id.* at 1136. Here, viewing the facts and drawing all reasonable inferences in Sorin's favor, the Court finds that Sorin has produced sufficient evidence to establish a fact issue over whether Tracy breached his duty of loyalty by ceasing to sell Sorin products, converting doctors to St. Jude, training for his St. Jude position, and participating in a valve transaction, all while still employed by Sorin.

St. Jude also argues that Sorin has not shown that St. Jude knew Tracy's conduct amounted to a breach of loyalty or that it substantially assisted him. These two elements are reviewed in tandem, and "where there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Witzman*, 601 N.W.2d at 188 (quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)). "Whether the requisite degree of knowledge or assistance exists depends in part on the particular facts and circumstances of each case." *Id.*

St. Jude has not put forth any reason why it would not know that Tracy's soliciting of customers for a competitor while employed would be a breach of the duty of loyalty. St. Jude is a sophisticated party engaged in the same business as Sorin and likely deals with the same issues with its own employees. (*See* Briant Decl., Ex. 32 at 76:10-77:14.) Viewing the facts in the light most favorable to Sorin, St. Jude likely knew that Tracy's actions to convert business while still employed constituted a breach of his duty of

loyalty.  Additionally, at this stage, many of the facts already discussed could support a finding that St. Jude substantially assisted or encouraged Tracy in breaching his duties to Sorin.  This evidence includes Homan's statement that "the surgeons have committed to switch to [St. Jude]," (*id.*, Ex. 47), as well as Homan's question to Tracy while negotiating his salary "how much can I say [you] can bring over?"  (*Id.*, Ex. 36 at TRACY_00000015.)  These facts suggest that St. Jude knew of and encouraged Tracy's breach of his duty of loyalty to Sorin.   Accordingly, Sorin has established sufficient issues of fact regarding whether St. Jude aided and abetted in Tracy's breach of his duty of loyalty to Sorin.

### E.      Tortious Interference with Prospective Economic Advantage

To succeed on a claim for tortious interference with a prospective economic advantage, Sorin must show: (1) a reasonable expectation of economic advantage, (2) St. Jude knew of Sorin's expectation of an economic advantage, (3) St. Jude intentionally interfered with the economic advantage either in an independently tortious manner or in violation of a state or federal statute or regulation, (4) in absence of St. Jude's wrongful conduct, it is reasonably probable that Sorin would have realized its economic advantage, and (5) damages.  *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

First, St. Jude argues that Sorin cannot establish a reasonable expectation of economic advantage.  In support, St. Jude cites a number of Florida cases to suggest that Sorin must show "an actual and identifiable understanding or agreement which in all

probability would have been completed if the defendant had not interfered," or "existing or prospective legal or contractual rights." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814-5 (Fla. 1994).  St. Jude argues that *Ethan Allen* was "cited with approval" by the Minnesota Supreme court in *Gieseke*.  However, the portion of the *Gieseke* opinion relied on by St. Jude only cited *Ethan Allen* as one of many cases supporting the proposition that "the majority of state courts . . . require the plaintiff to demonstrate the existence of a prospective economic advantage with at least one specific, identifiable third party with which the defendant interfered."  *Gieseke*, 844 N.W.2d at 221.  Thus, the Minnesota court did not adopt *Ethan Allen* in full and did not hold that a plaintiff must have "existing or prospective legal or contractual rights."  647 So.2d at 814.  Instead, *Gieseke* found that a plaintiff must identify particular client relationships that were harmed, and that "projection of future business with unidentified customers, without more, is insufficient as a matter of law."  *Id.* at 222-23.  Here, Sorin identified particular customers, Tampa General and Tampa VA.

St. Jude also argues that because Tampa General requested bids, Sorin's response was a "mere offer" that did not create sufficient legal rights to support a claim for intentional interference.  *See Gieseke*, 844 N.W.2d at 222; *Duty Free Americas Inc. v. Estee Lauder Cos., Inc.*, 946 F. Supp. 2d 1321, 1338 (S.D. Fla. 2013) (stating "a bidder generally cannot establish a protected business relationship with an entity soliciting bids through a competitive bidding process").  However, the instant case may differ from a typical bidding situation due to the particular industry involved because "cardiac surgeons develop long-term use patterns with respect to heart valves and repair

products."  (Briant Decl., Ex. 8 at 26.)   Sorin's relatively consistent historical sales at Tampa General suggest that it likely expected to continue success there.  (*See id.*, Ex. 39.) Sorin had a higher-than-average market share in the region, and it performed particularly well at Tampa General, where Tracy's market share was about 45%.  (*Id.*, Ex. 16 at 189:23-191:3.)  Accordingly, viewing the facts in the light most favorable to Sorin, a fact issue remains over its expectation of continued sales at Tampa General.

St. Jude next argues that Sorin has failed to show that St. Jude knew of Sorin's expectation of an economic advantage.  However, the evidence suggests that St. Jude expected that Tracy controlled much of the business at Tampa General, and therefore, that if Tracy were not recruited to St. Jude, Sorin's business would continue.[10]

Finally, St. Jude argues that Sorin cannot show intentional unlawful interference by St. Jude.  This prong requires that Sorin provide evidence showing that St. Jude intentionally interfered with its business in a way that was independently tortious or contrary to some statute or regulation.  *Gieseke*, 844 N.W.2d at 219.  In this case, Sorin has sufficiently supported the independent tort of tortious interference with contract, for the reasons discussed previously.

Accordingly, the Court will deny St. Jude's motion with regard to Sorin's claim based on tortious interference with prospective economic advantage because fact issues remain and St. Jude is not entitled to judgment as a matter of law.

---

[10] For example, St. Jude communications stated that Tracy would "transition $800k-$1 million within his first year," and that the "tactical plan" for Tampa General was, "Competitive Hire to convert business."  (Briant Decl., Ex. 25 at SJM_00002137, SJM_00002141.)

**F.      Promissory Estoppel**

In order to establish a claim for promissory estoppel, Sorin must show (1) a clear and definite promise made by St. Jude, (2) St. Jude intended to induce reliance and such reliance occurred to Sorin's detriment, and (3) the promise must be enforced to prevent injustice. *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000). Sorin bases its promissory estoppel claim on the following facts:  Sorin emailed St. Jude and questioned how Homan would be able to comply with her employment agreement while working for St. Jude in the same region, to which  St. Jude's in-house counsel, Melton-Meaux, replied, "I can assure that Danna is aware of and will meet her ongoing obligations to Sorin."  (Compl., Ex. C.)

A promise is clear and definite if "the promisor should reasonably expect to induce action or forbearance on the part of the promisee."  *Martens*, 616 N.W.2d at 746. Vague statements and statements of policy generally are not clear and definite promises. *See, e.g.*, *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 371-72 (Minn. 1995) (finding that "Good employees are taken care of" was not a clear and definite promise). Similarly, statements of fact that are "merely imparting information" are not considered clear and definite promises.  *See Servais v. T.J. Mgmt. of Minneapolis, Inc.*, 973 F. Supp. 885, 898 (D. Minn. 1997) (quoting *United Shippers Coop. v. Soukup*, 459 N.W.2d 343, 346 (Minn. Ct. App. 1990)).

Here, Melton-Meaux's response to Sorin's inquiry was not a clear and definite promise.  Melton-Meaux was imparting information – his belief that Homan was aware

of and would comply with her obligations.   Melton-Meaux then described Homan's responsibilities at St. Jude and suggested that Sorin could contact him if necessary to discuss the matter further.   (Compl., Ex. C.)   Thus, Melton-Meaux would not have reasonably expected to induce forbearance based on his comments, particularly where Sorin's initial inquiry reflected its belief that Homan could not possibly be complying with her obligations.   (*See* Markison Decl., Ex. 17.)   Instead, Melton-Meaux would expect that if Sorin was not satisfied, it would reach out to Homan or him with further questions.   Accordingly, the Court will grant St. Jude's motion with regard to Sorin's promissory estoppel claim for lack of a clear and definite promise.[11]

## II.      MOTION TO EXCLUDE EXPERT TESTIMONY

Sorin has moved to exclude portions of the report of St. Jude's expert, Maria Shepherd, under rule 702 and 403.   In particular, Sorin seeks to exclude Shepherd's opinions[12] and testimony about: (1) the regulatory propriety of Sorin's exchange of its tissue heart valve products, and (2) the reasons Sorin lost the Tampa General RFP.

---

[11] Because the Court dismisses Sorin's promissory estoppel claim for lack of a clear and definite promise, the Court need not address St. Jude's other arguments with regard to this claim, including that Sorin failed to satisfy the injustice factor, that the subject matter of the promise was already covered by a contract, and that Sorin did not establish damages due to its reliance on the promise.

[12] Preliminarily, Sorin contends that Shepherd's declaration, submitted along with St. Jude's response to the motion to exclude, should not be considered because it is untimely, and therefore, excludable as a sanction under Rules 16 and 37.   Sorin argues that Shepherd's declaration is inconsistent with Shepherd's earlier sworn statements and testimony.   Sorin bases this argument on Shepherd's deposition testimony in which she denied being an FDA expert when asked, and her statement explaining that what she meant by her deposition testimony was that she was not a "health-care lawyer, regulatory manager, or an FDA official."   (*Compare*

(Footnote continued on next page.)

Shepherd is a president of a "medical device marketing/business strategy and innovation research services provider," where she focuses on "commercializing medical products . . . in the medical device and diagnostic markets." (Decl. of Jared B. Briant in Supp. of Pl.'s Amended Mot. to Exclude ("Briant Decl. in Supp. of Mot. to Exclude"), Ex. I ("Shepherd Report") at 5, Oct. 19, 2015, Docket No. 140.) Before her current position, she "worked extensively in the medical device industry." (*Id.*) She has a degree in Biology and an MBA in marketing, and has worked in the medical device industry since 1994. (*Id.*)

## A.    Standard of Review

Expert testimony is governed by Federal Rule of Evidence 702. Rule 702 provides the following:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

(Footnote continued.)

Briant Decl. in Supp. of Mot. to Exclude, Ex. K ("Shepherd Dep.") at 235:3-5, *with* Declaration of Maria L. Shepherd ("Shepherd Decl.") ¶ 9, Nov. 9, 2015 Docket No. 148.) Sorin cites *Ladd v. Mohawk Carpet Distribution, L.P.*, No. 08-6470, 2010 WL 2541651, at *4-5 (D. Minn. Apr. 1, 2010), in which the court disregarded a witness's statements as a "sham affidavit" because her statements could not "be reasonably reconciled with her deposition testimony." *See also Escobedo v. Constr. Laborers' Educ., Training & Apprenticeship Fund of Minn. & N.D.*, No. 11-3653, 2012 WL 4838880, at *3 (D. Minn. Oct. 11, 2012) ("Under the sham affidavit doctrine, a district court may strike an affidavit which conflicts with deposition testimony and raises only sham issues of material fact."). Here, Shepherd's statement does not explicitly conflict with her prior testimony. Sorin can certainly use Shepherd's prior statement to call into question her knowledge about the FDA, but the declaration is not a sham affidavit because it can reasonably be reconciled with her prior statement. The Court finds no prejudice in allowing the declaration; Shepherd merely expands on her prior opinions, mainly in response to Sorin's criticisms. Accordingly, the Court will consider Shepherd's supplemental statement.

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the factors of the case.

Fed. R. Evid. 702.  The district court has a gate-keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his or her methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).  The reliability inquiry is designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 757 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The Eighth Circuit has held that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id.* at 758; *see also Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").  "Only if the expert's opinion is so fundamentally unsupported that it can offer

no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

### B.      Regulatory Propriety Opinion

Sorin contends that Shepherd's opinions about the regulatory propriety of its swapping out of its uncoated valve (Mitroflow LXA) for its coated valve (Mitroflow PRT) should be excluded.   Sorin argues that Shepherd is not an expert on FDA compliance, and therefore, she is not qualified to opine on this issue.   Sorin also argues that Shepherd's opinions on this issue should be excluded because they are irrelevant and would be unfairly prejudicial to Sorin.

In her expert report, Shepherd opines that "Sorin's handling of the 'swapping out' of the LXA for the PRT is questionable."   (Shepherd Report at 7.)   Shepherd relies on testimony from Sorin's employees suggesting that swapping out hospitals' inventories of uncoated Mitroflow for the coated version occurred in stages and much of the process was left up to its sales representatives.   (*Id.* at 35-36.)   Shepherd also relies on FDA guidance, which states that a recall is appropriate where the new product was intended to remedy a failure to meet specifications or failure to perform as expected.   (*Id.* at 38-39.) She opines that based on this FDA guidance, Sorin should have performed a national recall and failure to do so was "questionable."   (*Id.* at 39-43.)   According to Shephard, Tampa General's stated reason for choosing St. Jude over Sorin in the RFP process – "physician preference" – made "perfect sense given Sorin's actions" including "the

questionable manner in which Sorin ultimately elected to 'swap out'" the uncoated valve for a coated valve.  (Shepherd Decl. ¶ 14.)

Sorin first argues that Shepherd's opinions should not be admitted because she is not an expert in regulatory compliance.  Specifically, in her deposition, Shepherd was asked whether she considered herself an "FDA expert," and she responded that she did not.  (Briant Decl. in Supp. of Mot. to Exclude, Ex. K ("Shepherd Dep.") at 235:3-5.)  Then, when asked whether she considered herself an expert on "FDA regulations," "medical device product recalls," and "interpreting FDA guidance," she responded to each that she considered herself "knowledgeable" but "not an expert."  (*Id.* at 236:2-13.)  Also, she considered herself "very knowledgeable," but "not an expert," about determining whether a product swap-out should be a recall or an enhancement.  (*Id.* at 236:14-20.)  She also stated that she took classes on FDA regulations, attended training sessions, listened to experts talk about the FDA, and received formal training about managing a product recall.  (*Id.* at 236:21-238:22.)

Shepherd contends that when she said she was not an FDA expert, she meant she was "not a health-care lawyer, regulatory manager or an FDA official, and therefore [she does] not feel qualified to express an opinion whether a law or regulation has been violated."  (Shepherd Decl. ¶ 9.)  However, she states that she is qualified to provide expert opinions in her report based on her experience "with the regulatory standards that drive the ***business*** of medical devices to maximize compliance with FDA requirements and minimize the risk of any violations" as well as the impact of regulatory matters on a company's "image and relationship with hospital administrators."  (*Id.* ¶ 10.)  Shepherd

has experience dealing with "FDA-mandated processes," has assisted with product recalls in the past, and has received training on managing a product recall.  (Shepherd Dep. at 57:24-59:7, 59:18-24, 238:8-22.)  Thus, Shepherd has significant qualifications in the industry.  Accordingly, while she cannot say whether Sorin complied with FDA regulations, she may testify about whether its actions were reasonable marketing or business decisions and how they aligned with practices in the industry.  *See, e.g.*, *Lillebo v. Zimmer, Inc.*, No. 03-2919, 2005 WL 388598, at *5 (D. Minn. Feb. 16, 2005) (finding that an expert could not testify on the specific legal requirements of FDCA and FDA regulations and whether the defendant complied with these requirements, but that the expert could explain the general FDA process and whether the defendant's "actions were reasonable or appropriate").

Second, Sorin argues that even if Shepherd is qualified, her opinion about Sorin's product swap-out should not be admitted because it is not relevant.  Under Rule 702, expert opinions must "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert*, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.*  St. Jude contends that this testimony is relevant because the manner in which Sorin swapped out Mitroflow may have contributed to the physician preference at Tampa General not to use the Sorin valves, which is one of the key issues in this action.  Accordingly, at this stage in proceedings, the Court finds that the opinion is relevant.

Finally, Sorin argues that Shepherd's opinion should be excluded under Rule 403 because it is unfairly prejudicial.  Rule 403 permits exclusion of "evidence if its probative

value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. In *Target Corp. v. Greenberg Farrow Architecture, Inc.*, the Court excluded an expert opinion in part based on Rule 403, finding that "[t]he testimony's shaky factual foundation drastically reduces its probative value," and the "expert" label "could lead a jury to give [the expert's] causation theory more credibility than it deserves." No. 10-4810, 2012 WL 1963362, at *12 (D. Minn. May 31, 2012). Generally, however, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility," unless the opinions are "so fundamentally unsupported that [they] can offer no assistance to the jury." *Lillebo*, 2005 WL 388598, at *4. Here, Shepherd's opinions are not so fundamentally unsupported because she relied on her extensive background in the medical device industry; her opinions will therefore not be excluded.

## C.    Reasons Sorin Lost the RFP Opinion

Sorin also moves the Court to exclude the portion of Shepherd's expert report that discusses potential reasons why Sorin lost the Tampa General RFP. Sorin argues that Shepherd's conclusions lack a sufficient factual basis and are unduly prejudicial. Sorin specifically objects to two opinions in the report. First, Shepherd stated, "Negative clinical data published in highly credible peer-reviewed journals was the most significant root cause of the sales decline of Sorin's Mitroflow heart valve, and also contributed to Sorin's loss of the Tampa General RFP." (Shepherd Report at 11.) Second, Shepherd stated, "Sorin's low market share and lack of product diversity puts it at a disadvantage in

responding to RFPs from large hospitals who wish to bundle their portfolios, a fact that likely also contributed to Sorin's loss of the Tampa General RFP." (*Id.* at 22.)

Sorin challenges the factual basis for these opinions. However, as discussed above, a challenge to an expert's factual basis generally goes to his or her credibility, unless it is "so fundamentally unsupported that it can offer no assistance to the jury." *Target Corp.*, 2012 WL 1963362, at *10 (citing *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005)). Sorin argues that Shepherd's opinions about the reasons why Sorin's RFP proposal was not selected are not based in fact because she has no knowledge about the specific facts of that decision. Shepherd admitted that she did not talk to any of the physicians, employees, or staff at Tampa General. (Shepherd Dep. at 171:8-12; 176:22-177:2.) Instead, her opinions are based on her general understanding of the medical device market as well as her analysis of Mitroflow's clinical data and market trends. (*See* Shepherd Report at 11-22.) However, the fact that her opinions are based on applying her general knowledge of the industry to the facts of this case does not make them so fundamentally unsupported as to warrant their exclusion. Shepherd analyzed and compared Sorin's explant rate to that of its competitors. (*Id.* at 12; Shepherd Dep. at 178:7-179:11.) She also considered market trends and the disadvantages of companies like Sorin with a smaller market share and limited product lines. (Shepherd Report at 18-19; Shepherd Dep. at 166:1-167:20.) Thus, her opinions have factual support and will not be excluded.

Sorin also argues that Shepherd's opinions are unreliable or irrelevant because she ignores the impact Tracy may have had on the RFP decision. *See Solheim Farms, Inc. v.*

*CNH Am., LLC*, 503 F. Supp. 2d 1146, 1151 (D. Minn. 2007) (excluding expert opinion in part based on a finding that it was irrelevant because the expert did not apply theory to the underlying facts). However, Shepherd testified that that she considered alternative theories, including evidence concerning Tracy's departure from Sorin, but decided not to include them in her report because she considered them "inconclusive." (Shepherd Dep. at 222:13-20; Shepherd Decl. ¶ 26.) Thus, she did not ignore relevant facts, but rather considered them and decided that they were irrelevant. Sorin is free to question Shepherd's disregard for Tracy's influence on the RFP decision on cross-examination.

Finally, Sorin argues that Shepherd's opinions on this issue would cause undue prejudice to Sorin and have the potential to mislead the jury. Sorin is correct that there is a legitimate danger in permitting an expert to "draw an inference that the jury can reach on its own." *Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166, 1173 (D. Minn. 2012). But the Court finds that principle inapplicable here because jurors do not necessarily have the knowledge about or experience with the medical device industry to draw these conclusions on their own. Accordingly, the Court will allow Shepherd's opinions about possible reasons why Sorin lost the RFP.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

- 44 -

1.      Defendant's Motion for Summary Judgment [Docket No. 102] is **GRANTED in part** and **DENIED in part** as follows:

a.      The motion is **GRANTED** as to Plaintiff's promissory estoppel claim.  The promissory estoppel claim is **DISMISSED with prejudice**.

b.      Plaintiff's unjust enrichment claim and her aiding and abetting claim, to the extent it is based on Homan's breach of legal duties, are **DISMISSED as withdrawn**.

c.      The motion is **DENIED** in all other respects.

2.      Plaintiff's Amended Motion to Exclude Portions of Expert Report and Opinions of Maria Shepherd [Docket No. 136] is **DENIED**.


DATED:  March 31, 2016                     _____s/ _John_ H. _Tunheim_____
at Minneapolis, Minnesota.                       JOHN R. TUNHEIM
                                                                  Chief Judge
                                                      United States District Court